# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

GENE PAUL RICHARDS, SR.,      )    CASE NO. 1:12-cv-832

                )

       Plaintiff,       )    JUDGE ADAMS

                )

       v.           )    MAGISTRATE JUDGE

                )    VECCHIARELLI

MICHAEL J. ASTRUE,      )

    Commissioner of Social Security,  )

                )

       Defendant.     )    **REPORT AND RECOMMENDATION**

      Plaintiff, Gene Paul Richards ("Plaintiff"), challenges the final decision of

Defendant, Michael J. Astrue, Commissioner of Social Security ("Commissioner"),

denying his applications for a Period of Disability ("POD") and Disability Insurance

Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, *et

seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is

before the undersigned United States Magistrate Judge pursuant to an automatic

referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons

set forth below, the Magistrate Judge recommends that the Commissioner's final

decision be REVERSED and REMANDED for proceedings consistent with this Report

and Recommendation.

## I.   PROCEDURAL HISTORY

      On January 26, 2009, Plaintiff filed applications for POD and DIB, alleging a

disability onset date of November 1, 2007.  (Transcript ("Tr.") 18.)  The applications

were denied initially and upon reconsideration, and Plaintiff requested a hearing before

an administrative law judge ("ALJ").  (*Id.*)  On July 1, 201, an ALJ held Plaintiff's

hearing.  (*Id*.)  Plaintiff appeared, was represented by a non-attorney representative, and testified.  (*Id*.)  A vocational expert ("VE") also testified.  (*Id*.)  On August 27, 2010, the ALJ found that Plaintiff was not disabled.  (*Id*.)  On February 7, 2011, the Appeals Counsel declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision.  (Tr. 1.)

On April 4, 2012, Plaintiff filed his complaint to challenge the Commissioner's final decision.  (Doc. No. 1)  On September 24, 2012, Plaintiff filed his Brief on the Merits.  (Doc. No. 24.)  On October 25, 2012, the Commissioner filed his Brief on the Merits.  (Doc. No. 25.)  On November 8, 2012, Plaintiff filed a Reply Brief.  (Doc. No. 26.)

Plaintiff argues that there is insufficient evidence to support the ALJ's determination of his residual functional capacity ("RFC") because the ALJ violated the treating physician rule and failed properly to evaluate Plaintiff's credibility.  Plaintiff further argues that, because the VE based his testimony on a flawed hypothetical, the ALJ erred in relying on the VE's testimony regarding whether Plaintiff could perform work.

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was born on November 14, 1965, and was 41 years old on his alleged disability onset date.  (Tr. 27.)  He attended school through the eighth grade,[1] and was

---

[1]    In his decision, the ALJ found that Plaintiff had at least a high school education.  (Tr. 27.)  At his administrative hearing, however, Plaintiff testified that he "made it to the eighth grade in school," and that he was placed in classes for students with learning disabilities.  (Tr. 45.) Plaintiff does not raise

2

able to communicate in English.  (*Id.*)  Plaintiff had past relevant work as a union

carpenter.  (Tr. 26.)

### B.  Medical Evidence

#### 1.  Treating Providers

On November 2, 2007, Plaintiff was treated in the emergency department at

Lake Hospital after experiencing shortness of breath and chest pain at work.  (Tr. 181.)

Physicians at Lake Hospital noted his history of asthma.  (*Id.*)  He was diagnosed with

atypical chest pain and an asthma attack, and discharged.  (Tr. 187-88.)

On March 24, 2008, Plaintiff sought treatment from Samuel J. Daisley, D.O., his

family physician, for low back pain.  (Tr. 290.)  Plaintiff reported a history of surgery to

his legs due to fractures, as well as a skin graft on his leg.  (*Id.*)  Dr. Daisley noted that

Plaintiff was undergoing pain management with some improvement.[2]  (*Id.*)  On April 18,

2008, Plaintiff complained to Dr. Daisely of bilateral leg pain and low back pain, as well

as "resting tremors" and anxiety.  (Tr. 286.)  Dr. Daisley diagnosed Plaintiff with

depressive disorder and other malaise and fatigue.  (Tr. 287.)  He prescribed Celexa.

(*Id.*)  On May 5, 2008, Dr. Daisley noted Plaintiff's complaints of leg pain and continued

anxiety.  (Tr. 284.)

On May 9, 2008, after complaining of chest pain, Plaintiff underwent a stress

test.  (Tr. 280-83.)  The test revealed a "mild but essentially fixed inferior perfusion

---

this discrepancy in his Brief.

[2]  The treatment note from March 24, 2008 indicates that Plaintiff was
"follow[ing] up on low back pain."  (Tr. 290.)  However, there is no earlier
record from Dr. Daisely reflecting that Plaintiff had previously complained of
low back pain.  Nor are there any records from a pain management specialist.

3

defect consistent with a prior nontransmural myocardial infarction." (Tr. 283.)  The examiner discontinued the test due to Plaintiff's complaints of leg pain and dyspnea. (*Id*.)  Plaintiff's functional capacity was rated as below average.  (Tr. 280.)

On July 8, 2008, Plaintiff reported to Dr. Daisley that his back was "still sore," but that he wanted to decrease his pain medications.[3] (Tr. 276.)  Dr. Daisley diagnosed Plaintiff with lumbar sprain, prescribed oxycodone, and directed him to return in two weeks.  (Tr. 277.)  On July 23, 2008, Plaintiff reported that his back pain had increased. (Tr. 274.)  An August 4, 2008 CT scan of Plaintiff's lumbar spine revealed a mild loss of the L5-S1 disc space, mild diffuse bulges of the L2-L3, L3-L4, L4-L5 and L5-S1 discs, and no significant foraminal narrowing.  (Tr. 273.)  On August 8, 2008, Dr. Daisley's examination revealed lumbar tenderness, limited motion, muscle spasms and decreased deep tendon reflexes.  (Tr. 271.)  Dr. Daisley diagnosed Plaintiff with depressive disorder and a displaced lumbar intervertebral disc without myelopathy, continued his oxycodone, and directed him to return in one month.  (Tr. 272.)  Plaintiff continued to complain of low back pain at examinations throughout the remainder of 2008.  (Tr. 269-70 (September 5, 2008), 267-68 (October 3, 2008), 263-64 (November 3, 2008), 261-62 (December 1, 2008)), with Dr. Daisley noting decreased deep tendon reflexes and lumbosacral tenderness (Tr. 269).  On December 30, 2008, Plaintiff reported pain rated at 6 out of 10, and examination revealed "severe" lumbar tenderness.  (Tr. 259-60.)  Plaintiff continued on oxycodone.  (Tr. 260, 262, 268, 270.)

In January 2009, Dr. Daisley completed an Attending Physician's Statement of

---

[3]  No prior entry in the record reflects that Plaintiff had been prescribed any pain medication.

4

Disability for an unspecified entity, in which he noted that Plaintiff complained of severe pain, rated at an 8 out of 10, that was "barely controlled with pain med[ications]," and that a CT scan revealed "several mild bulging discs [in the] lumbar sacral spine." (Tr. 240.) Dr. Daisley reported diagnoses of lumbago, left shoulder pain, and displacement of lumbar intervertebral disc without myelopathy. (*Id.*) Dr. Daisley opined that Plaintiff would not be able to return either to his regular work or to some other type of employment, and that Plaintiff was not a suitable candidate for a rehabilitation program. (Tr. 241.)

On March 19, 2009, Dr. Daisley completed a Multiple Impairment Questionnaire prepared by Plaintiff's counsel. (Tr. 197-204.) Dr. Daisley noted diagnoses of lumbosacral sprain and depression, and identified Plaintiff's lumbosacral pain and x-ray findings as positive clinical findings that supported his diagnoses. (Tr. 197.) Dr. Daisley described Plaintiff's pain as constant, ranging in intensity from 7 to 8 out of 10, and located in Plaintiff's legs and lumbosacral region. (Tr. 198-99.) Dr. Daisley opined that Plaintiff could sit for six hours in an eight-hour workday, and would stand/walk for up to one hour in an eight-hour workday. (Tr. 199.) According to Dr. Daisley, Plaintiff would need to get up and move around every 15 minutes, and should not sit or stand/walk continuously in a work setting. (Tr. 199-200.) Dr. Daisley determined that Plaintiff could never lift or carry, that he had marked or moderate limitations in using his upper extremities; that he could not push, pull, kneel, bend or stoop; and that he should avoid heights. (Tr. 200-01, 203.) Dr. Daisley noted that Plaintiff had unspecified psychological limitations. (Tr. 203.) Dr. Daisely opined that Plaintiff was unable to work as a result of his conditions, and noted that Plaintiff's emotional condition was affected

5

by the fact that his son was undergoing treatment for cancer.[4]  (Tr. 202.)  In a March 23, 2009 letter, Dr. Daisley stated that Plaintiff was unlikely to recover any further.  (Tr. 196.)

Plaintiff, complaining of low back pain, continued to treat with Dr. Daisley throughout 2009 and 2010.  (Tr. 255-56 (January 28, 2009), 253-54 (February 27, 2009), 251-52 (April 7, 2009), 249-50 (May 27, 2009), 247-48 (June 25, 2009), 245-46 (July 23, 2009), 243-44 (September 11, 2009), 395-96 (February 1, 2010), 397-98 (March 1, 2010), 399-400 (March 26, 2010), 402-03 (April 23, 2010), 404-05 (May 24, 2010), 363-64 (June 18, 2010).)  Examinations revealed lumbosacral tenderness and spasms, as well as decreased deep tendon reflexes.  (Tr. 243-44, 255-56, 364, 396, 398, 400.)  Dr. Daisley noted diagnoses of lumbago, displacement of lumbar intervertebral disc without myelopathy, general anxiety disorder and depressive disorder.  (Tr. 244, 254, 256, 364, 396, 398, 400, 403.)  In July 2009, Dr. Daisley noted that Plaintiff rated his pain at 7 out of 10.  (Tr. 245.)  Plaintiff continued on oxycodone and Celexa.  (Tr. 246, 252, 254, 256, 396, 398, 400, 403, 405.)  In April 2010, Dr. Daisley prescribed Oxycontin in addition to the oxycodone.  (Tr. 403.)  In June 2010, Dr. Daisley noted that Plaintiff was using a cane to ambulate.  (Tr. 364.)

On May 27, 2010, upon referral by Dr. Daisely, Plaintiff underwent a nerve conduction study performed by Stephen G. Paxson, D.O.  (Tr. 361-62.)  Dr. Paxson noted that Plaintiff had "significant physical impairment in both lower extremities."  (Tr.

---

[4]  The administrative record reflects that, throughout Plaintiff's treatment with Dr. Daisley, Plaintiff's son was undergoing treatment for leukemia.  (Tr. 243-44, 245-46.)  A February 2010 record from Dr. Daisley notes that Plaintiff's son passed away due to leukemia at age 18.  (Tr. 395.)

361.)  The study revealed minimal left tibial nerve motor neuropathy, severe left superficial nerve neuropathy, moderate to moderately severe right superficial peroneal nerve sensory neuropathy, potential S1 pathology, and subconscious back spasm and chronic back pain.  (Tr. 362.)  Dr. Paxson noted that Plaintiff was using a cane.  (Tr. 362.)  He opined that Plaintiff was unemployable due to his physical condition and noted that he had recommended that Plaintiff apply for disability.  (*Id.*)

On June 21, and 24, 2010, Dr. Paxson completed impairment questionnaires prepared by Plaintiff's counsel.  (Tr. 365-70 (Upper Extremity Questionnaire), 371-78 (Lower Extremity Questionnaire), 379-85 (Spinal Impairment Questionnaire).)  He diagnosed Plaintiff with back pain, leg pain and depression and opined that his prognosis was "poor."  (Tr. 379.)  Dr. Paxson stated that there was "no way" that Plaintiff could sit or stand/walk during a normal workday; that he could occasionally lift/carry up to ten pounds, but could never lift any weight over ten pounds; that Plaintiff was in constant pain that would not improve over the subsequent 12 months; that Plaintiff could not tolerate even low stress because stress exacerbated his pain; that Plaintiff would need to avoid wetness, noise, fumes, gases, temperature extremes, humidity, dust and heights; and that Plaintiff could not push, pull, kneel, bend or stoop.  (Tr. 367, 376, 379-85.)  Dr. Paxson noted that pain interfered with Plaintiff's ability to ambulate; that Plaintiff used a cane; and that Plaintiff was unable to climb stairs without a handrail and required assistance in activities of daily living.  (tr. 374.)  Dr. Paxson concluded that Plaintiff was "totally physically unable to maintain a work position" (Tr. 385), was not capable of performing work that required activity on a sustained basis (Tr. 368), and "can't work" (Tr. 369.)

7

On June 24, 2010, psychologist Paulette A. Tomasovich, Ph.D, who noted that she had been treating Plaintiff on a monthly basis since January 2010, completed a Psychiatric Impairment Questionnaire prepared by Plaintiff's counsel.[5]  (Tr. 386.)  She diagnosed Plaintiff with moderate to severe major depression with psychotic features, and noted the recent death of his son.  (*Id*.)  She assigned him a Global Assessment of Functioning ("GAF") score of 55, noting that his lowest GAF in the past year was 50. (*Id*.)  Dr. Tomasovich described Plaintiff's prognosis as "[g]uarded due to combination of coping [with] loss of son and numerous debilitating physical illnesses."  (*Id*.)  She noted the following clinical findings that supported her diagnosis: poor memory, appetite disturbance with weight change, sleep disturbance, mood disturbance, emotional lability, anhedonia or pervasive loss of interests, psychomotor agitation or retardation, feelings of guilt, difficulty thinking or concentrating, suicidal ideation or attempts, social withdrawal, and bereavement.  (Tr. 387.)

Dr . Tomasovich concluded that Plaintiff was mildly limited in his ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and to respond appropriately to changes in the work setting; moderately limited in his ability to interact appropriately with the general public and to set realistic goals or make plan independently; and markedly limited in his ability to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to accept instructions and respond appropriately to criticism from supervisors,

---

[5]  Dr Tomasovich's treatment records are not included in the administrative transcript.

8

and to travel to unfamiliar places or use public transportation.  (Tr. 390-91.)  She reported that Plaintiff experienced episodes of deterioration or decompensation, specifically noting that Plaintiff's emotional instability was "high [with] pronounced episodes of instability and social withdrawal."  (tr. 391.)  Dr. Tomasovich concluded that Plaintiff was, at that time, incapable of tolerating even low stress, and that his impairments could be expected to last at least twelve months.  (*Id.*)

An August 6, 2010 MRI of Plaintiff's lumbar spine revealed 3 mm of retrolisthesis of L2 on L3, L3 on L4 and L4 on L5; dessication and mild narrowing of the L2-L3 through L5-S1; Schmorl's node[6] along the superior endplate of L3; and mild bulging discs with level of facet hypertrophy in the lumbar spine without significant thecal sac or foraminal stenosis.  (Tr. 413.)

## 2.      Agency Reports and Assessments

On May 30, 2009, agency consulting psychologist Margaret Zerba, Ph.D., diagnosed Plaintiff with adjustment disorder with depression, severe chronic pain and problems with mobility.  (Tr. 212.)  Plaintiff described a history of injuries to his legs, wrists, elbow and back caused by a motorcycle accident when he was 19 years old, as well as a fall at work seven years prior.  (Tr. 209.)  He reported to Dr. Zerba that he had stopped working in November 2007 after he had an asthma attack and fell at work.  (Tr. 210.)  She found no impairment in Plaintiff's ability to understand and follow directions; to pay attention to perform simple, repetitive tasks; and to relate to others in the work

---

6     Schmorl's node is "an irregular or hemispherical bone defect in the upper or lower margine of the body of the vertebra."  *Dorland's Illustrated Medical Dictionary* 1270 (Saunders, 30th ed. 2003).

9

environment.  (*Id*.)  She determined that Plaintiff's ability to withstand the stress and pressures of day to day work activity was moderately impaired due to his depression regarding his medical problems and physical limitations.  (Tr. 213.)  She assigned Plaintiff a GAF score of 58.  (*Id*.)

On June 18, 2009, agency consulting psychologist Caroline Lewin, Ph.D., performed a mental RFC assessment as well as a psychiatric review technique.  (Tr. 214-17, 218-31.)  She found that Plaintiff was moderately limited in his ability to understand and remember simple instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and to respond appropriately to changes in the work setting.  (Tr. 214-15.)  Dr. Lewin opined that Plaintiff retained "the ability to cope with most instructions in a low stress work setting where concentration needed was only short term," that Plaintiff would "be cooperative with others," and that he might "occasionally lack initiative to sustain a normal workday."  (Tr. 216.)  Dr. Lewin diagnosed Plaintiff with adjustment disorder with depression.  (Tr. 221.)  She determined that he was mildly limited in activities of daily living and maintaining social functioning; and moderately limited in maintaining concentration, persistence and pace.  (Tr. 228.)

On July 4, 2009, agency consulting physician W. Jerry McCloud, M.D., performed a physical RFC assessment, noting the following restrictions: Plaintiff could lift 50 pounds occasionally and 25 pounds frequently; could stand and/or walk and sit

for a total of about six horus in an eight-hour workday; could never climb ladders, ropes or scaffolds; and had to avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation.  (Tr. 232-36.)

In an October 5, 2009 case analysis, consulting psychologist Leslie Rudy, Ph.D., affirmed Dr. Lewin's assessment of Plaintiff's mental RFC.  (Tr. 312.)  Dr. Rudy noted that Dr. Daisley had not referred Plaintiff for further mental health treatment.  (*Id*.)

On November 16, 2009, agency consulting physician William Bolz, M.D., performed a physical RFC assessment.  (Tr. 313-20.)  He noted the following restrictions: Plaintiff could lift and/or carry 20 pounds occasionally and ten pounds frequently; could stand and/or walk and sit for about six hours in an eight-hour workday; could never climb ladders, ropes and scaffolds; and could occasionally climb ramps and stairs, stoop and crouch.  (Tr. 314-16.)  Dr. Bolz opined that Plaintiff's allegations were credible in nature but not severity, noting that Plaintiff had not alleged any upper extremity issues to his physicians, and that the CT scan of his lumbar back showed only mild bulging with no evidence of stenosis or foraminal narrowing.  (Tr. 318.)

### C.    Hearing Testimony

#### 1.    Plaintiff's Testimony

Plaintiff testified as follows at his July 1, 2010 administrative hearing:

He lived with his wife in a house.  (Tr. 39.)  His 18-year old son had passed away just before Christmas in 2009.  (*Id*.)  Plaintiff had not worked since November 2007, and had been receiving unemployment benefits until approximately one year before the hearing.  (Tr. 39-40.)  He stopped working because he could no longer perform his work

due to problems with his back and legs.  (Tr. 40.)

Plaintiff drove no more than a couple of times each month, and had "issues" with dressing and bathing.  (Tr. 41.)  Plaintiff could lift and carry about 20 pounds, and had difficulty sitting.  (*Id*.)  He could walk "a couple blocks," and spent his day watching television.  (*Id*.)  He had no hobbies.  (Tr. 41-42.)  Plaintiff could sit for about 20 or 30 minutes before he had to get up and move around, and could stand for about the same amount of time.  (Tr. 43.)  Although he could use the stairs, he avoided them because he had fallen a few times.  (*Id*.)  Plaintiff was taking pain medication for his back and legs, and he rated his pain as ranging from a 5 to 11 out of 10.  (Tr. 40-41, 44.)  His pain was exacerbated by activity.  (Tr. 44.) He also experienced numbness in his left hand on a daily basis, which lasted for one to three hours and made it difficult to use that hand.  (Tr. 43-44.)

Plaintiff described his depression as, "I just don't want to do anything, [or] go nowhere, don't want to see no people."  (Tr. 46.)  He ate only once a day because he had no appetite.  (*Id*.)  He napped multiple times each day, as he was unable to sleep for longer than a few hours at a time.  (Tr. 47.)  Plaintiff used to swim, hunt, fish, shoot bows and skeet shoot.  (Tr. 47-48.)  However, he no longer had any interest in his hobbies, or in socializing.  (Tr. 46, 48.)  On "bad days," he rarely got out of bed due to the pain and depression.  (Tr. 48.)  He had three or four "good days" each month.  (Tr. 48-49.)

### 2.    VE Testimony

The ALJ posed the following hypothetical to the VE:

> Assume that I would find Mr. Richards or a hypothetical individual possesses the residual functional capacity [inaudible] light work as defined in the regulations.  The full range [inaudible] the following.  This individual can lift and carry 10 pounds frequently, 20 pounds occasionally.  Can sit for eight hours in an eight-hour day, can walk or stand six hours in an eight-hour day. And should be allowed an alternating sit-stand option at will.  No climbing.  Only occasional bending or squatting.  No work overhead.  No pushing or pulling of more than 10 pounds.  And this individual is limited to simple, repetitive one-to-three step job tasks without frequent interaction with the general public. Assuming Mr. Richard's age, education and work experience, are there jobs that he can perform?

(Tr. 50.)  The VE opined that the hypothetical individual described by the ALJ could perform work as a small products assembler, office helper or hand packer.  (Tr. 51.)

Plaintiff's representative asked the ALJ whether an individual with the following physical limitations could perform any work:

> [T]he ability to sit for two hours, stand and walk for up to one hour.  Marked limitations with regards to using the arms for reaching.  Inability to lift and carry even five pounds.  And constant interference with attention, concentration due to pain, fatigue or other symptoms.

(Tr, 51-52.)  The ALJ responded that the limitations described by Plaintiff's representative would "eliminate all work."  (Tr. 52.)  Further, the VE opined that an individual with the mental limitations described by Dr. Tomasovich in her impairment questionnaire, and who would be absent more than three times each month, would not be capable of performing any work.  (Tr. 52.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when he establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered

13

disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a). To receive SSI benefits, a recipient must also meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§

14

404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    Plaintiff meets the insured status requirements of the Act through December 31, 2012.

2.    Plaintiff has not engaged in substantial gainful activity since November 1, 2007, the alleged onset date.

3.    Plaintiff has the following severe impairments: degenerative disc disease (lumbar); depression (adjustment disorder); and neuropathy.

4.    Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.    After careful consideration of the entire record, the undersigned finds that Plaintiff has the RFC to perform light work as defined in 20 CFR §§ 404.1567(b) except for the following: Plaintiff can lift/carry no more than 10 pounds frequently; Plaintiff can lift/carry no more than 20 pounds occasionally; Plaintiff can sit for 8 hours in an 8-hour workday; Plaintiff can stand/walk for 6 hours in an 8-hour workday; Plaintiff must have the option to alternate sitting and standing at will; Plaintiff cannot perform any climbing; Plaintiff can perform no more than occasional bending and squatting; Plaintiff cannot perform work overhead; Plaintiff can perform no pushing/pulling of more than 10 pounds; Plaintiff can perform no more than simple, repetitive, 1, 2, 3 step job tasks; and Plaintiff must perform work without frequent interaction with the general public.

6.    Plaintiff is unable to perform any past relevant work.

7.    Plaintiff was born on November 15, 1965, and Plaintiff was 41 years old, which is defined as a younger individual age 18-49, on November 1, 2007, the alleged disability onset date.

8.    Plaintiff has at least a high school education (12th grade) and is able to communicate in English.

      *    *    *

10.   Considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that

Plaintiff can perform.

11.    Plaintiff has not been under a disability, as defined in the Act, from November 1, 2007, through the date of this decision.

(Tr. 20-28.)

## V.    LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports

the opposite conclusion.  *Ealy*, 594 F.3d at 512.

### B.    Plaintiff's Arguments

Plaintiff argues that the ALJ's determination of his RFC is not supported by sufficient evidence in the record because the ALJ violated the treating physician rule and failed to properly evaluate Plaintiff's credibility.  Plaintiff further argues that, because the VE based his testimony on a flawed hypothetical, the ALJ erred in relying on the VE's testimony regarding whether Plaintiff could perform work.  The Commissioner argues that substantial evidence supports the ALJ's conclusions, and that the RFC adequately accounts for Plaintiff's limitations.

### 1.    Whether the ALJ Violated the Treating Physician Rule

"An ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record.'"  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted).  Conversely, a treating source's opinion may be given little weight if it is unsupported by sufficient clinical findings and is inconsistent with the rest of the evidence. *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993).  If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *See Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)).  This "clear elaboration requirement" is "imposed

17

explicitly by the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is to "let claimants understand the disposition of their cases" and to allow for "meaningful review" of the ALJ's decision, *Wilson*, 378 F.3d at 544 (internal quotation marks omitted).  Where an ALJ fails to explain his reasons for assigning a treating physician's opinion less than controlling weight, the error is not harmless and the appropriate remedy is remand.  *Id.*

Here, Plaintiff argues that the ALJ erred by failing to give good reasons for assigning minimal weight to Plaintiff's treating physicians, Drs. Daisley, Paxson and Tomasovich.  Plaintiff's argument is well taken with respect to the opinions of Drs. Daisley and Tomasovich.[7]  In the portion of his decision assigning weight to the various sources of information in the record, the ALJ stated as follows:

> Also, the undersigned assigns minimal weight to the opinions in Exhibit 3F, Exhibit 8F, Exhibit 9F, Exhibit 15F, Exhibit 16F, Exhibit 17F, Exhibit 18F, Exhibit 19F, and Exhibit 20F.  (20 C.F.R. 4040.1527 and SSR 96-6p).  The opinions in Exhibit 3F, Exhibit 8F, Exhibit 9F, Exhibit 15F, Exhibit 16F, Exhibit 17F, Exhibit 18F, Exhibit 19F, and Exhibit 20F are given minimal weight because they are not supported by and are not consistent with the evidence of record as a whole.

(Tr. 26.)  The vast majority of the exhibits listed by the ALJ were medical records and opinion evidence from Drs. Daisley and Tomasovich.  Other than this brief paragraph – which does not even describe the individual records themselves – the ALJ offered no analysis or explanation to support his conclusion that the records and opinions from these physicians were either unsupported by, or inconsistent with, the record.

---

[7]   There is no dispute that Drs. Daisley and Tomasovich were Plaintiff's treating physicians.

18

The ALJ's conclusory statement does not amount to giving "good reasons" for rejecting the opinions of Drs. Daisley and Tomasovich.  *See Wilson*, 378 F.3d at 545 (finding that the ALJ's "summary dismissal" of the opinion of the claimant's treating physician failed to satisfy the "good reasons" requirement).  The ALJ failed to identify the record evidence that contradicted the opinions of Plaintiff's treating physicians, or to describe how their opinions lacked support in, or were inconsistent with, the record as a whole.  *See, e.g., Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 552 (6th Cir. 2010) ("Put simply, it is not enough to dismiss the treating physician's opinion as incompatible with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick.").  Further, this is not a case in which the ALJ's discussion of other medical opinions in the record provides a clear basis for rejecting the treating physicians' opinions.  *See, e.g., Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470-71 (6th Cir. 2006) (finding that the ALJ's discussion of other medical evidence and opinions made it clear that the opinions of the claimant's treating physicians were inconsistent with the record evidence as a whole and, thus, "implicitly provided" sufficient reasons for rejecting their opinions).  Rather, the ALJ's discussion of the other medical opinions in the record was similarly brief and conclusory.  (Tr. 26.)  Accordingly, the ALJ's explanation for the weight he assigned to the opinions of Drs. Daisley and Tomasovich frustrates the dual purposes of the "good reason" requirement: It neither sufficiently described to Plaintiff the basis for the ALJ's conclusions, nor provided this Court with adequate material for meaningful review.

The Commissioner argues that the ALJ correctly assigned minimal weight to the

19

opinions of Drs. Daisley and Tomasovich because the record demonstrates that their opinions were unsupported and conclusory and, in the case of Dr. Daisley, inconsistent with his own treatment records.  The ALJ, however, did not identify or discuss these rationales for rejecting their opinions.  "[T]he courts may not accept appellate counsel's *post hoc* rationalizations for agency action.  It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Berryhill v. Shalala*, 4 F.3d 993, *6 (6th Cir. Sept. 16, 1993) (unpublished opinion) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) (citation omitted)).  Further, even if the record bears out the Commissioner's arguments, "a court cannot excuse the denial of a mandatory procedural protection simply because . . . there is sufficient evidence in the record for the ALJ to discount the treating source's opinion and, thus, a different outcome on remand is unlikely.  '[A] procedural error is not made harmless simply because [the aggrieved party] appears to have had little chance of success on the merits anyway.'" *Wilson*, 378 F.3d at 546 (quoting *Mazaleski v. Treusdell*, 562 F.2d 701, 719, n.41 (D.C. Cir. 1987)).

Because the ALJ failed to explain why he assigned minimal weight to the opinions of Drs. Daisley and Tomasovich, the ALJ's decision is not supported by substantial evidence.  For this reasons, it is recommended that this case be remanded to the ALJ for a more careful examination of the opinions of these two physicians, and, if the ALJ declines to assign them controlling weight, a complete explanation of why he reached that conclusion.[8]

---

[8]  The Commissioner also argues that the ALJ was entitled to assign little weight to Dr. Daisley's conclusory opinion that Plaintiff was disabled.  It is well

## 2.    Whether Dr. Paxson Was a Treating Physician

Plaintiff argues that Dr. Paxson's opinion also is entitled to controlling weight. The Commissioner disputes this and argues that Dr. Paxson was not Plaintiff's treating physician.  Plaintiff's argument is not well taken.

The regulations define a "treating source" as "your own physician . . . who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you."  20 C.F.R. § 404.1502.  A nontreating source is "a physician . . . who has examined you but does not have, or did not have, an ongoing treatment relationship with you."  *Id.*  In his Brief, Plaintiff contends that, while Dr. Paxson's treatment records are not included in the administrative record, the assessment questionnaires reflect that, in addition to performing a nerve conduction study on Plaintiff in May 2010, Dr. Paxson treated Plaintiff on June 21, 2010.  (Plaintiff's Brief ("Pl. Br.") at 5.)  The record, however, does not support that assertion.  In the June 2010 Lower Extremity Impairment Questionnaire, Dr. Paxson stated that Plaintiff was "not [his] patient," but, rather, that he had only performed the May 2010 nerve conduction study on Plaintiff, and Plaintiff had returned to him in June 2010 to obtain the completed questionnaires.  (Tr. 377.)  Accordingly, the record reflects that Plaintiff was examined by Dr. Paxson on one occasion, and, thus, his opinion is not entitled to any special deference.  *See Atterberry*

established that "treating source opinions on issues that are reserved for the Commissioner are never entitled to controlling weight or special significance."  SSR 96-5p, 1996 WL 374183, *2 (July 2, 1996).  However, in addition to Dr. Daisley's opinion that Plaintiff was disabled, the record contains evidence of his other opinions and conclusions.

21

*v. Sec'y of Health & Human Servs.*, 871 F.2d 567, 572 (6th Cir. 1989).

### 3.  Plaintiff's Remaining Arguments

Plaintiff argues that the ALJ improperly assessed his credibility, in part because the ALJ relied on medical evidence from the record that was not consistent with Plaintiff's testimony, and did not discuss evidence that supported Plaintiff's subjective complaints of pain and limitations.  Plaintiff also argues that, because the VE based his opinion regarding Plaintiff's ability to perform work on an RFC that is not supported by sufficient evidence, the VE's opinion was flawed.  These arguments, however, address conclusions of the ALJ that may change after careful examination of the opinions of Plaintiff's treating physicians.  If the ALJ conclude that the opinions of Drs. Daisley and Tomasovich merit controlling weight, or greater weight than what he previously assigned to them, he might reassess Plaintiff's subjective complaints with respect to whether they are supported by these opinions.  He may also formulate a new RFC, which would necessarily require a new opinion from the VE.  Accordingly, this Court need not address Plaintiff's remaining arguments.

### VI.  CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be REVERSED and REMANDED for proceedings consistent with this Report and Recommendation.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: December 17, 2012

22

## **OBJECTIONS**

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1).  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**

23